UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 4:19 CR 00312 CDP |
| v. | ) | |
| | ) | |
| STEVEN V. STENGER, | ) | |
| | ) | |
| Defendant. | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by and through Reginald Harris, Attorney for the United States, and Hal Goldsmith, Assistant United States Attorney for the Eastern District of Missouri, and for its Sentencing Memorandum, states to this Honorable Court as follows:

1.      By any standard or measure, defendant Steven Stenger's criminal conduct calls for a significant prison sentence. Application of the United States Sentencing Guidelines here advises a sentence of 37 to 46 months' imprisonment. Anything less would ignore the extent of defendant's criminal conduct and the substantial harm defendant's conduct caused to the public.

2.      Title 18, United States Code, Section 3553(a) sets out the factors this Court should consider in fashioning an appropriate sentence. The first such factor to be considered is the nature of the offense, 18 U.S.C. 3553(a)(1).  St. Louis County, Missouri is the largest county and political subdivision in Missouri, with approximately 1,000,000 residents.  In comparison, Jackson County, the state's second largest county, has approximately 700,000 residents (which includes 480,000 residents who reside within Kansas City), and St. Louis City has approximately 330,000 residents.  The approximately 1,000,000 residents of St. Louis County all depended upon defendant Stenger to do the right thing as the elected County Executive, and

1

to provide them with his honest services.  Through his extensive criminal conduct he abused their trust in a substantial and harmful way.  He placed his own personal interests and political ambitions above all else, and engaged in a classic illegal pay to play scheme in order to fill his own political coffers to fuel his political campaigns.  Defendant's criminal acts were for his own personal gain, aimed at continuing his reign of power and authority in St. Louis County and, because of the county's significant population base, throughout the entire region and state.

3.	This Court need only look to the language of the Grand Jury's Indictment returned in this case to get a clear picture of the nature and extent of defendant's criminal conduct.  Defendant used his position to reward political donors with contracts and grants, requiring subordinate employees who depended upon him for their jobs to take actions which were illegal and unethical, many times with the threat of termination, express or implied, hanging over the employees' heads.  Defendant's criminal conduct relative to his pay to play scheme began *even before* he was first sworn in as County Executive in January, 2015, when, on November 25, 2014, following his election, defendant directed the CEO of the St. Louis Economic Development Partnership to extend a lobbying contract to one of defendant's significant political donors.  (Indictment at paragraph 31)  Defendant's pay to play schemes continued *throughout the entirety* of his tenure as County Executive, at least through December, 2018 when he directed three members of his executive staff, and the CEO of the St. Louis Economic Development Partnership, to once again ensure the extension of the lobbying contract on behalf of the very same political donor, identified as the owner of "Company One" in the Indictment.  In many contracting situations there were one or more competing bids, and defendant's directive to award the contract to a political donor disadvantaged the competing bidders, as, for example, in the December, 2018 lobbying contract situation.  Those individuals

2

and companies that submitted bids expecting a level playing field were also victimized by defendant's pay to play scheme.  It is abundantly clear from the evidence gathered in this case that one of defendant's primary concerns was that his political donors receive the desired contract or grant, and that he continue to personally win politically.

Defendant often appointed Board Members who he knew would take their direction from him in order to carry out his directives.  For example, defendant appointed his Chief of Policy and his Chief of Staff, along with several other "friendly" individuals, to the Board of the St. Louis Economic Development Partnership.  Defendant recommended Sheila Sweeney be appointed as CEO of the Partnership because he knew he could manipulate and control her, as he did relative to the Cardinal Consulting contract through the Port Authority and the Wellston Holdings land deals through the LCRA.  Defendant's actions and conduct were aimed at ensuring that his directives in favor of his political donors were followed.

Defendant's "politics" is what mattered to him.  He directed that political cronies and their family members be hired by St. Louis County as part of his effort to maintain his political position, and to continue his scheme.  As he told his executive staff on January 4, 2019, when discussing his desire that the County Council not know which of the numerous department budgets his various non-merit hires were being paid from:

> "That's one of the greatest powers I have.  That I have 52 people who I hire and nobody knows where they're coming from.  For instance, there are 2 slots over at the jail.  Nobody knows if Julia Childrey [Director of Department of Justice Services] put those people there, or I did.  It's good f---ed up.  We like it f---ed up.  I care about my politics."

Defendant's pay to play scheme in which he collected hundreds of thousands of dollars in political donations for his own benefit was not only criminal, but also reveals a flagrant disregard for the interests of those he was elected to serve.  It matters not that the bribes were in

the form of campaign donations, and not direct payments to defendant.  The fact that he used the bribes to fuel his political campaigns freed up his own funds to use for his own personal lifestyle.  For example, in the early years of his political career, defendant found it necessary to loan his campaign account approximately $400,000.  Through his political fundraising and criminal scheme, following the November, 2018 general election he was able to pay himself back that $400,000 directly out of his campaign account.  For over four years he treated important government contracts and grants as something to barter away as if they were his own personal thank you gifts.  Looking at the nature and circumstances of defendant's offenses under any imaginable standard, this Court should view them as serious offenses.

4.      The next factor to be considered by this Court in sentencing defendant are the history and characteristics of defendant, 18 U.S.C. 3553(a)(1).    As to defendant's history and characteristics,  one need only look to the year 2018, the most recent year of defendant's tenure as County Executive, to understand that defendant placed politics and personal gain over the needs of the residents he was sworn to serve.  In addition to his criminal conduct, Stenger "checked out" during 2018, spending little time in his County Executive office, while most of his focus was on fund raising for his own August primary and November general elections.  As he told his executive staff in a private conversation on November 7, 2018, following the general election:

> STENGER:  "How 'bout that motherf---ers?  I don't show up to the Council meetings.  I don't do f---ing shit.  I've been sitting at my house for the past two months f---ing raising money and then won by 20%!  The world's a f---ed up place."

During 2018, in addition to fund raising, Stenger also spent a considerable amount of his time planning and advocating for the merger of St. Louis City and County, a plan put forth by an organization known as Better Together.  Better Together's ultimate plan to merge the City and

County required an Amendment to the Missouri State Constitution, anticipated to be put to Missouri voters during 2020.

The operations and activities of Better Together which were aimed at the consolidation of St. Louis City and County were funded, primarily, by financier Rex Sinquefield.  Sinquefield was a major donor to Stenger's 2018 re-election campaign, contributing approximately $700,000 through various of his own organizations and political action committees to Stenger's political efforts.  Defendant Stenger was motivated to seek re-election as County Executive during 2018 in large part by his desire to be named Metro Mayor in Better Together's consolidation plan, as discussed in a private conversation with his executive staff on October 9, 2018.

> STENGER:  "And in my second term I really don't want to do anything, I just don't.  If we don't get 2020 done I'd have to reevaluate, I don't know if I want to do another four years, it just depends what it looks like."

In order to further tie himself to the Better Together merger plan, during October, 2018, defendant Stenger directed that the husband of Rex Sinqefield's chief of staff be hired by St. Louis County, and given the title of "senior policy advisor for administration and strategic initiatives." At defendant Stenger's direction, this individual (referred to here as "John Doe") was paid $130,000 per year in his St. Louis County position.  Unbeknownst to John Doe, defendant Stenger advised his executive staff in a November 7, 2018 private conversation that he hired John Doe to personally benefit from his own relationship with Better Together.

> November 7, 2018:
>
> STENGER:  "I have aligned myself, the very best way you can be aligned with these guys [Better Together], which is like John Doe, which is like, I'll explain it to both of you [William Miller and Jeff Wagener] in person.  John Doe is here for one reason and one reason only.  John Doe is an insurance policy.  His wife is working for Rex, it's a good faith effort on my part, I'm saying, hey look at, I'm willing to hire John Doe at 130 Grand.  She's Rex's assistant.  Kind

> of sends a message to all of them that I trust them. And they've
> done a lot to demonstrate that they trust me and they should.
> They've given me a lot of money, they're almost up to like 700
> Grand."

When defendant Stenger's executive staff complained about John Doe, Stenger advised his staff

in a November 8, 2018 private conversation:

> STENGER: "I just want him to shut up, and make your 130 Grand
> and leave everybody alone. Quit doing what he's doing. If he
> doesn't like it, I guess he could go somewhere else, but I'd rather
> have him stay, then I can get my money. Just enjoy himself, enjoy
> the chain of command. Some people are here because they're
> married to the Chief of Staff of Rex Sinquefield, and you're one of
> them. Calm down." [1]

Thus, just as defendant directed contracts to his political donors in his criminal pay to play scheme,

his desire to continue receiving political fundraising support drove his advocacy on behalf of the

Better Together plan, not a desire to serve the people. Further, defendant Stenger was motivated

to advocate for Better Together's merger plan by the fact that the St. Louis County Council, whose

Members had been in conflict with Stenger for months, would no longer exist in a merged

Metropolitan City. Stenger told members of his executive staff in a November 7, 2018 private

conversation:

> STENGER: "The only thing that's really going to kill these guys
> [St. Louis County Council Members] is what's coming in 2020. I'm
> telling you, we all need to embrace the f--- out of this. Embrace it.
> I mean embrace it. We've got to pray that we pass this f---ing
> thing….This answers a lot of our f---ing problems. Who wants to
> do another term with these people? I'd rather wipe them out."

In the final analysis, as in his pay to play scheme, defendant was motivated to support the Better

Together merger plan for all of the wrong personal reasons, with no concern for the residents of

---

[1] Despite John Doe's efforts to work on County projects following his hiring, he was assigned very little substantive County work by Stenger or Stenger's Chief of Staff, Bill Miller, and he worked primarily on Better Together matters, while being paid with St. Louis County funds.

St. Louis County.   As Stenger told executive staff members and close associates in private conversations:

> November 7, 2018:
>
> STENGER:  "We're pretty solid with leadership, with me being the person.  I'm trying to get the Amendment to be drafted so I'm the leader.  I'm just being overly cautious because I don't want some f---ing last minute change f--- me over."
>
> *   *   *   *
>
> December 6, 2018:
>
> STENGER:  "I could give a f--- about 2020.  I'm in the amendment. People are going to have me whether they like me or not…."

In further considering defendant's history and characteristics, throughout his tenure as County Executive, Stenger let his drive for personal political gain control his actions, as opposed to doing what was in the best interest of St. Louis County.  When a St. Louis County employee, a company seeking to do business with St. Louis County, or someone in the political world took an action which Stenger viewed as adverse to his own political ambitions or as undercutting his authority and position of power as County Executive, he advocated strong retribution against that individual or company, including the threat of termination when it was a County employee.  Just as defendant favored his political donors in his criminal pay to play scheme, defendant looked to punish those who crossed him politically or who refused to carry out his directives.  As noted in the Indictment and in defendant's Plea Agreement, when St. Louis County's Director of Administration, Pamela Reitz, refused to comply with Stenger's directives to issue contracts to his political donor John Rallo's insurance company, Stenger threatened to fire her.

Another example involved the St. Louis County Counselor.  During November 2018, St. Louis County voters overwhelmingly approved Proposition Z which increased County sales taxes

for a St. Louis Zoo development initiative.  The State of Missouri Department of Revenue, however, raised a question concerning the legality of the increased sales tax.  The St. Louis County Counselor then issued a legal opinion that the Proposition Z sales tax, passed by the voters, was appropriate and legal.  Stenger, upset that the County Counselor had issued the legal opinion in support of the proposition, threatened to terminate him.  Stenger discussed the issue with members of his executive staff on January 2, 2019:

> STENGER:  "This jackoff [County Counselor] does not understand he was appointed by me.  Everything he does comes back on me….Why would you ever give a legal opinion without talking to your boss.  I'm his boss.  If you don't think I'm your boss, you're going to find out in about 10 f---ing seconds….I'm the boss.
> F---ing don't issue a legal opinion again without me or I'll fire your f---ing ass.  I'm f---ing done with that guy, I really am done….I'm not going to have a County Counselor who's not mine….I appointed him for a reason, because he's mine.  We even talked to him about it, who f---ing cares, we were all happy if the Zoo didn't get the f---ing tax.  I don't care.  I hope they don't.  I really don't f---ing care.  It does nothing for me."

A further example involved a significant minority contractor in the St. Louis area whose mother is a former Missouri State Representative.  Stenger was supporting St. Louis County legislation that would fund the expansion of America's Center in downtown St. Louis.  The proposed expansion would create substantial construction jobs for area companies.  Relative to the America's Center expansion project, Stenger advised his executive staff on December 3, 2018, that the contractor would not receive any work on the project solely as a result of his mother's political actions:

> STENGER:  "We're not going to advance our bill if [Contractor] is anywhere near this thing, it's not happening.  Not.  His f---ing Mom did commercials against me.  If we let that go, we're just the f---ing pussies of the universe.  It's not going to happen.  It sends a message to him.  F--- you.  And to her, f--- you.  He just lost out on probably 2% of a giant project.  I mean, literally, that's 7 Million Dollars to him."

8

As previously noted, during 2018 there was significant conflict between defendant Stenger and Members of the St. Louis County Council.  The Chair of the County Council during 2018 was Dr. Sam Page, and Stenger and Dr. Page often were at odds with each other.  A further example of Stenger's vindictive nature and character while serving as County Executive involved Dr. Page's employment as a physician.  Stenger discussed Dr. Page in a private discussion with members of his executive staff on October 19, 2018.

> STENGER:  "I'm going to meet with the head of [Page's Employing Hospital] and let him know what's going on with Sam.  I think he already knows, but I'm gonna tell him, look man, there's nothing personal, but this is gonna get real personal with Sam over the next two years, so you may not want him at your f---ing place any more.  Get him fired.  I'm serious too.  It's serious.  I'm gonna f---ing unload on this guy, professionally…."

5.       This Court's sentence should also afford adequate deterrence to criminal conduct, 18 U.S.C. 3553(a)(2)(B).  This defendant was the duly elected County Executive for St. Louis County.  He was charged with overseeing and running the operations of that public entity on behalf of its one million residents. Defendant also exercised considerable authority and influence over the County's affiliated organizations, including the St. Louis Economic Development Partnership, the St. Louis County Port Authority, and other similar organizations.  This Court should fashion a significant punishment not only to deter this defendant from future criminal conduct, but in order to deter other individuals in similar governmental positions from committing similar crimes. The government submits that a significant prison sentence in this case will have that desired deterrent effect.

6.       Upon being indicted by the Grand Jury for the instant offenses, defendant took several actions.  He resigned his position as County Executive, and surrendered his Missouri law license and his CPA license.  Within 5 days following his arraignment, defendant pled guilty

to the Indictment.  The government submits that defendant's guilty plea was the result of the overwhelming evidence against him, of which he and his counsel were aware.  Defendant's law license would have been suspended pending full disbarment proceedings based upon the charges and conviction in this case.  He would have ultimately been barred from the practice of law for a minimum of five (5) years by the Missouri Supreme Court.  Likewise, defendant's position as County Executive would have been terminated based upon the charges and conviction in this case.  Defendant has been awarded acceptance of responsibility under the United States Sentencing Guidelines in this case as a result of his guilty plea.  The fact that he resigned his elected position and surrendered his law license should not be the basis for any further sentencing benefit in this case.  In a public corruption case such as this, removal from public office or resignation from one's elected position is the ordinary and inevitable result.  Similarly, a practicing attorney who commits these types of crimes will have his license suspended and will be barred from the future practice of law.  There is nothing extraordinary about defendant's actions in this regard.  Any suggestion by defendant that the surrender of his law license, and his resignation from elected office should inure to his benefit at sentencing should be rejected by this Court.  Instead, this Court should hold this defendant to a higher standard of conduct precisely because of defendant's status as a licensed attorney and his position as having been the highest elected official in the largest county in the State of Missouri.  If the Court were to consider these collateral consequences in framing a more lenient sentence, it would be tantamount to favoring criminals with privileged backgrounds.

7.      Defendant has an advisory guideline sentence under the United States Sentencing Commission Guidelines of 37-46 months in prison. The government submits that there is no basis whatsoever in the law or the underlying facts and circumstances here that would justify a

downward variance to a sentence less than the advisory guideline sentence. It is the government's position that justice and fairness require a significant sentence of imprisonment in this case. As a direct result of defendant's criminal conduct, the adverse impact upon St. Louis County and its residents who rely upon their elected officials to perform their jobs honorably and with integrity has been substantial. This is *not* a victimless crime. The defendant's pay to play scheme, which went on for many years and impacted many contracts and grants, was aimed at illegally filling his political coffers so that he could maintain his position of power and authority, all to the detriment of the County's residents.  Our public officials should be held accountable for their criminal conduct by appropriate prison sentences; the victim residents deserve it, and fairness and justice require it.

8.     In fashioning an appropriate sentence here, this Court needs to have a full and clear understanding of the adverse impact defendant's criminal conduct has had on the residents of St. Louis County, St. Louis County Government, and the St. Louis Economic Development Partnership and its affiliated organizations, the St. Louis County Port Authority and the Land Clearance for Redevelopment Authority of St. Louis County. Attached as Government Exhibits 1 - 4 to this Sentencing Memorandum are four (4) letters which articulate in a way that the undersigned cannot the truly substantial and harmful impact that defendant's criminal conduct had upon these individuals and entities.  How does one even begin to measure the loss of trust in its leaders by the citizens of St. Louis County as a result of defendant's crimes?

9.     Only a significant prison sentence will adequately reflect the seriousness of the offense, promote respect for the law, and provide just punishment for defendant's criminal offenses as is required by 18 U.S.C. 3553(a)(2)(A).  As President Roosevelt said:

> There can be no crime more serious than bribery.  Other offenses
> violate one law while corruption strikes at the foundation of all

law.  Under our form of Government all authority is vested in the people and by them delegated to those who represent them in official capacity.  There can be no offense heavier than that of him in whom such a sacred trust has been reposed who sells it for his own gain and enrichment….

Theodore Roosevelt, *Third Annual Message to the Senate and House of Representatives* (Dec. 7, 1903).  Those words are as meaningful and applicable today, in the instant case, as they were when uttered 116 years ago.  After all, public service is a public trust.  Defendant broke that trust here and should be justly punished.

WHEREFORE, the United States of America prays that this Honorable Court sentence defendant to an appropriate term of imprisonment within the advisory guideline range, without a downward variance, and for such other relief as this Court deems appropriate and just under the circumstances.

Respectfully submitted,

REGINALD HARRIS
Attorney for the United States

*/s/Hal Goldsmith*
HAL GOLDSMITH #32984MO
Assistant United States Attorney
111 S. 10th Street, Room 20.331
St. Louis, Missouri 63102
(314) 539-2200

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2019, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon the defendant's counsel of record.

*/s/ Hal Goldsmith*
HAL GOLDSMITH, #32984MO
Assistant United States Attorney