UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.: 4:19-cr-312 CDP |
| | ) |
| STEVEN V. STENGER, | ) |
| | ) |
| Defendant. | ) |

**SENTENCING MEMORANDUM**

COMES NOW Defendant, Steven Stenger ("Stenger"), by and through counsel, files the following memorandum for sentencing.

**I. Background**

On April 25, 2019, the government filed a three-count indictment, alleging Stenger deprived the citizens of St. Louis County of the right to his honest services. *See Indictment* [Doc. Text #1]. Eighth days later, Stenger pled guilty to the indictment, pursuant to a written agreement. *See* Doc. Text. 22. In the agreement, the parties estimated a total offense level of 21 and anticipated an advisory guideline range of 37 to 46 months. *See* Plea Agreement at ¶ 13; *see also* Presentence Investigation Report at ¶ 8 [hereinafter "PSR"]. The PSR confirms these estimates. *See id.* at ¶¶ 88, 92, and 124. For the reasons below, a sentence of 37 months will prove sufficient, but not greater than necessary, to comply with the purposes of sentencing.

**II. The Purposes of Sentencing**

There are four purposes of sentencing, retribution, deterrence, incapacitation, and rehabilitation, s*ee Tapia v. United States*, 564 U.S. 319, 325 (2011), and, under 18 U.S.C. § 3553(a), this Court must impose a sentence "sufficient, but not greater than necessary, to comply

1

with [these purposes]." The United States Sentencing Commission's ("the Commission") Guidelines identify a sentence of between 37 and 46 months as appropriate to meet these purposes based on the offense and offender facts they consider.[1] But the available information and Stenger's history and characteristics show the statutory purposes of sentencing do not justify a sentence in excess of the low-end of this range.

### A.  Retribution

Of the purposes of sentencing, retribution is the most difficult to measure. But it is not altogether immeasurable, and retribution-related factors commonly relied on by courts in similar cases to justify downward variances and low-end sentences warrant the same sentencing consideration here.

First, prior to sentencing, Stenger paid restitution in the amount of $130,000, the full amount due under the Mandatory Victim Restitution Act. *See* PSR at ¶ 136. This payment returns to St. Louis County the funds wrongly paid to John Rallo, *see id.* at ¶ 70, 136, relieves less culpable defendants in related cases of the restitution obligation they would otherwise incur, *see id.* at ¶¶ 12-14, and reflects Stenger's contrition for his misconduct. Post *United States* v. *Booker*, 543 U.S. 220 (2005), courts within this district and otherwise have commonly relied on this same ground to vary downward from the Guidelines, an outcome for which Stenger himself does not argue or ask. *See e.g.*, *United States v. Samuel Glasser*, 4:10-CR-283 HEA (E.D. MO 2011) (granting a 15-month downward variance from the low-end of the Guideline range for a bank fraud defendant who paid full restitution by sentencing); *United States v. Patrick Hogan*, 4:12-cr-300 JAR (E.D. MO 2012) (granting a twelve-month downward variance from the low-end of the Guideline range

---

[1] These facts include the underlying honest services fraud offense, the monetary loss amount involved in the offense, Stenger's aggravated role in the offense, his abuse of a position of public trust, and his criminal history category I status. *See* PSR at ¶¶ 78, 79, 81-82, 90-94.

2

for a conspiracy to commit mail fraud defendant who paid full restitution by sentencing); *Parry v. United States*, 2018 WL 189271 at *2, *4 (D. MD. 2018) (granting a nine-month downward variance from the low-end of the Guideline range for a wire fraud and money laundering defendant who cooperated with the victim and paid full restitution by sentencing); *United States v. Curry*, 523 F.3d 436, 439-440 (4th Cir. 2008) (affirming a five-month downward variance from the low-end of the Guideline range for a mail and wire fraud defendant who a paid full restitution by sentencing); *United States v. Devoy*, 2005 WL 1563337, *1, *4-*5 (E.D. Wisc. 2005) (granting a six-month downward variance from the low-end of the Guideline range for mail and wire fraud defendant who paid full restitution by sentencing).

Second, Stenger accepted responsibility early on, pled guilty within eight days of his indictment, and worked towards resolution of his case well before he was indicted – steps that reflect his regret and spared the government scarce prosecutorial resources. *See* Margareth Etienne, 78 N.Y.U. L. Rev. 2103, 2160 "(2001) Remorse, Responsibility, And Regulating Advocacy:  Making Defendants Pay For The Sins Of Their Lawyers ("[T]he swift and efficient resolution of cases is a worthy goal that [] leads to the significant improvement of a criminal justice system that already is bogged down with needless bureaucracy. Frivolity, delay, and hindrance of the administration of justice are not without heavy costs.").

Third, Stenger relinquished his position as St. Louis County Executive on the day his indictment was unsealed, surrendered his Missouri law license on the day he pled guilty, and surrendered his Illinois license less than 30 days later.  In addition, ten days after he pled guilty, he notified the Missouri State Board of Accountancy ("the Board") of his indictment and guilty plea, and he expects the Board to act against his license at its next meeting.  Each of these acts reveals Stenger's recognition of his own wrongdoing and saved St. Louis County, its citizens, and

multiple State boards the unnecessary expenditure of time, energy, and money. Moreover, the consequences of these acts will reverberate well into the future, and, among other things, affect Stenger's capacity to earn an income generally and provide for his family in particular – an additional punishment not contemplated by the Guidelines, whether one thinks this added punishment appropriate or not.

In sum, a low-end sentence will (1) give equal and appropriate consideration to retribution-related factors commonly relied on by courts in similar cases to justify downward variances and low-end sentences and (2) encourage future defendants to accept responsibility quickly and mitigate their offense harms.

### B. Deterrence

General deterrence does not justify a sentence in excess of 37 months. In fact, "[l]ittle credible evidence" suggests increases in sentence severity reduce crime through general deterrence. *See e.g.*, *United States v. Yeaman*, 248 F.3d 223, 238 (3rd Cir. 2001) ("It is widely recognized that the *duration* of incarceration provides little or no general deterrence for white collar crimes.") (citation omitted) (emphasis in the original); *see also* Cheryl Marie Webster and Anthony N. Doob, *Searching for Sasquatch: Deterrence of Crime through Sentence Severity*, The Oxford Handbook of Sentencing and Corrections, p. 174-175, Oxford University Press (2012) ("Despite enormous research efforts, no credible consistent body of evidence has been found to support the conclusion that harsher sentences (within ranges conceivable in Western democracies) achieve marginal deterrent effects on crime.");Valerie Wright, Ph.D., Research Analyst, The Sentencing Project, *Deterrence in Criminal Justice: Evaluating Certainty Versus Severity of Punishment* at 9 (2010) ("Existing evidence does not support any significant public safety benefit of the practice of increasing the severity of sentences by imposing longer prison

terms. In fact, research findings imply that increasingly lengthy prison terms are counterproductive."); Anthony N. Doob, Cheryl Marie Webster and Rosemary Gartner, *Issues Related to Harsh Sentences and Mandatory Minimum Sentences:  General Deterrence and Incapacitation,* at A-3, University of Toronto, Centre for Criminology & Social Studies, (2014) ("At this point, we think it fair to say that we know of no reputable criminologist who has looked carefully at the overall body of research literature on 'deterrence through sentencing' who believes that crime rates will be reduced, through deterrence, by raising the severity of sentences handed down in criminal courts."); Michael Tonry, *Learning from the Limitations of Deterrence Research*, Chicago Journals, Crime and Justice, Vol. 37, No. 1, University of Chicago Press (2008), pp 301-302 ("It is unclear to me which is more surprising: that so little credible evidence exists that criminal behavior is much affected by changes in punishment policies or that policy makers continue to believe that policy changes significantly affect behavior and that research continues to test for their crime-preventive effects.")

"Three National Academy of Science panels, all appointed by Republican presidents, [have] reached [this] conclusion, as has every major survey of the evidence."  Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006).

Research abroad has concluded the same, *see e.g.,* Andrew Von Hirsch, et. al., Cambridge University, *Criminal Deterrence and Sentence Severity:  An Analysis of Recent Research* (1999) (finding no data to support a statistically significant correlation between increases in sentence severity and crime rate reductions); *see* also David Farrington, et al., *Changes in Crime and Punishment  in America, England, and Sweden between the 1980s and the 1990s, Studies in Crime Prevention*, 3:104-131 (1994) (comparing crime and punishment trends

5

in the United States, England, and Sweden and failing to detect any decrease in crime rates as a result of increases in sentence severity), as has more recent research published in *Federal Probation*. *See e.g.*, Kelli D. Tomlinson, *An Examination of Deterrence Theory: Where do We Stand?*, 8-Dec. Fed. Probation 33 (2016) (concluding "non-legal factors, such as marriage, employment, peers, morality, disapproval from loved ones, ostracism, and shame, hav[e] more impact on conformity than do sanctions and threats.").

In short, no evidence indicates that a sentence in excess of 37 months will better promote the purpose of general deterrence than will a sentence of 37 months.

### C.  Incapacitation

Incapacitation does not justify a sentence greater than 37 months either. Stenger's criminal history category I status reflects his reduced re-offense risk relative to similarly situated offenders in all other criminal history categories. *See* United States Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, pp. 28-30 (May 2004) [hereinafter "*Measuring Recidivism*"]. But his re-offense risk is lower than most criminal history category I offenders, as well. Stenger is a married 47-year-old with a college education and a longtime history of employment. *See* PSR at ¶¶ 95, 96, 105-108, 117-115. The Guidelines' criminal history computation excludes these variables from its calculus. *See generally, Measuring Recidivism*. Yet, according to the Commission, they strongly correlate with reduced re-offense rates, *see id*. at 28-30 (noting older offenders are less likely to re-offend than younger offenders, offenders with more education are less likely to re-offend than offenders with less education, offenders employed in the year prior to their offense are less likely to re-offend than offenders without such employment, and married and are less likely to re-offend than offenders who have never married) and distinguish Stenger as

6

substantially less likely to re-offend than most of his criminal history category I counterparts.  *See id*.  Stenger's status as a true "first offender"[2] does the same and, in the words of the Commission, places him among the "federal offenders who are the least likely to reoffend."  *Recidivism and The "First Offender":  A Component of the Fifteen Year Report on the United States Sentencing Commission's Legislative Mandate* at 17.

### D.  Rehabilitation

Stenger has several rehabilitative needs.  *See* PSR at ¶¶ 101-104.  But those needs do not justify a sentence beyond 37 months.  Indeed, most research indicates that rehabilitative services are best delivered within a community setting, rather than a setting of confinement.  *See e.g.*, Washington State Institute for Public Policy: *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates*, Exh. 4 at 9 (October 2006) (finding rehabilitative services delivered in non-custodial settings reduce recidivism rates at greater rates than do services delivered in custodial settings); *see also* Bruce P. Archibald, *Let My People Go: Human Capital Investment And Community Capacity Building via Meta/Regulation in a Deliberative Democracy–A Modest Contribution for Criminal Law and Restorative Justice*, 16 Cardozo J. Int'l & Comp. L. 1 at 79 (2011) (noting imprisonment isolates offenders from regular social interactions, inhibits their capacity to interact positively with well-integrated members of society, and disrupts family relationships).

More importantly, under existing precedent, courts cannot lengthen a term of imprisonment to promote a defendant's rehabilitation.  *See Tapia v. United States*, 564 U.S. 319,

---

[2]  The term "first offender" includes offenders with one or more prior arrests.  It excludes offenders with one or more prior convictions.  *See Recidivism and The "First Offender":  A Component of the Fifteen Year Report on the United States Sentencing Commission's Legislative Mandate, Introduction (May 2004)*.  Most Criminal History Category I offenders have one or more prior convictions and are not first-offenders.  *See id.* at 17.  Stenger has no prior convictions or arrests.  *See* PSR at ¶¶ 90-94.

7

335 (2011) ("As we have held, a court may not impose or lengthen a prison sentence to enable an offender to compete a treatment program or otherwise to promote rehabilitation."). They can and should, however, impose supervised release conditions to further rehabilitative needs where appropriate. *See* 18 U.S.C. § 3583 (instructing courts to consider a defendant's rehabilitative needs in determining the conditions of supervised release to impose).

### III.  History and Characteristics

Stenger is 47 years-old and was born to a working-class South St. Louis family. *See* PSR at ¶ 95. His father worked as a lineman for Southwestern Bell and died three years ago after a long battle with depression and dementia. *See id*. His mother, who raised the couple's children, passed five years earlier from cancer. *See id*. Stenger has three siblings, all of whom live and work in the St. Louis area. *See id*. Stenger and his siblings are close, just as he is with his extended family, who describe him as thoughtful, generous, and kind. *See* Sentencing Letters.

From high school on, Stenger worked ordinary jobs to pay his way through higher education. *See id*. In 1998, he started a law firm with two partners. *See* PSR at ¶¶ 107, 117. By all accounts, he served his clients well, took pro bono matters regularly, and gave his time and assistance to family, friends, and strangers alike. *See* Sentencing Letters. The firm he started grew and continues to this day, though without his further participation. *See id*.

In 2009, Stenger married his wife, Allison. They have two children in common, ages three and five, and a third child who they will welcome into their family in September. *See* PSR at ¶ 97. Allison remains supportive of her husband and an extended family will assist her while Stenger serves his sentence.

In 2014, Stenger left his firm to run for St. Louis County Executive. In that office, he made choices that violated federal law, abused the trust of his constituents, and adversely

8

affected County government. This Court will sentence him for those wrongs. Yet, in that same time, his administration made positive contributions to the community. Among other things, it initiated a program to allow doctors and pharmacists to share patient histories and thus reduce the risk of opioid over-prescription. To date, the program covers some 80 percent of the State's population. It advocated to enact a half-cent sales tax to raise revenue for St. Louis County police and public safety. The County uses the revenue it continues to raise from this tax to add staff to its police force, implement community policing, increase officer pay, and buy new technologies like dash- and bodycams. It helped expand a federally funded summer food program for children 18 years of age and younger and opened the Castle Point Community Center with a math and science camp. It also led the effort to reform the County pension fund and reduce its reliance on general revenue by an anticipated tens-of-millions in the years to come. In addition, it assisted institutions like the University of Missouri at St. Louis to secure a $4.5 million grant to bring about criminal justice reform - an effort that has so far resulted in an approximate 22 percent reduction in the County Jail population between July 2018 and May 2019. These contributions also comprise a part of Stenger's 47-year history should figure into this Court's § 3553(a) analysis.

## V.  Conclusion

The Guidelines advise a sentence of 37 to 46 months. But the purposes of sentencing do not justify a sentence in excess of the Guidelines minimum. Retribution-related factors commonly relied on by courts in similar cases to justify downward variances and low-end sentences also warrant a low-end sentence here and, on the data, no other statutory purpose of sentencing justifies a sentence greater than 37 months.

9

In addition, Stenger's offense has cost him much, well beyond that which the Guidelines contemplate, even if in part those costs are warranted. He has lost the livelihood he worked his way through school to earn, is the subject of public opprobrium, and is an object of regular public scorn - some based on fact, but some most assuredly not.

Moreover, though his offense is serious, on balance, Stenger has lived a pro-social, productive, and positive life in which he has done more good than harm in both his personal and professional lives.

For these reasons among others, a sentence of 37 months imprisonment in the Bureau of Prisons, two years of supervised release, restitution in the amount of $130,000, and a mandatory special assessment of $300 will better comply with the purposes of sentencing, the mandate of 18 U.S.C. § 3553(a), and the individualized form of sentencing envision by *United States v. Booker* than will a sentence of 38 months or more.

Respectfully submitted,

By:   /s/ *Adam D. Fein*_____
ADAM D. FEIN, #52255 MO
Attorney for Defendant
120 S. Central Avenue, Suite 130
Clayton, Missouri 63105
(314) 862-4332/Facsimile (314) 862-8050
Email: afein@rsflawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that on August 4, 2019, the foregoing was electronically filed with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Mr. Hal Goldsmith, Assistant United States Attorney.